J-S41009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                              :         PENNSYLVANIA
                              :
            v.                :
                              :
                              :
DAVID JOSEPH JENNER           :
                              :
            Appellant         :  No. 735 EDA 2024

Appeal from the Judgment of Sentence Entered September 27, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0001590-2022

BEFORE:  MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED NOVEMBER 26, 2024**

David Joseph Jenner (Appellant) appeals from the judgment of sentence imposed following his non-jury convictions of two counts of aggravated assault, and one count each of first-degree murder, possession of an instrument of crime, and recklessly endangering another person.[1]  Appellant raises a sole challenge to the sufficiency of the evidence supporting his murder conviction.  We affirm.

The trial court detailed the factual history in its opinion:

> On December 18, 2021, … Charlie Thomas [(the victim or the decedent)] and his mother, Alice Pattinson [(Pattinson)], … lived together at 605 Veterans Highway ("the Thomas residence")[,] in Bristol Township, Bucks County, along with [Pattinson's] other son Christopher, and two family friends — Kevin Konrad [(Konrad)] and Warren Longstreet [(Longstreet)].

_____

[1] 18 Pa.C.S.A. §§ 2702(a)(1) and (a)(4), 2502(a), 907(a), 2705.

[N.T., 7/31/2023,] at p. 45. The Thomas residence is a two-story, single-family home with a full[,] separate apartment in the finished basement[, where Konrad resided]. *Id.* at p. 34. …

….

At the time of [the victim's] murder, Appellant[, the victim's cousin,] was the Thomas residence's most recent addition. Prior to his arrival, Appellant, who had just been released from prison, was residing in a motel room paid for by his mother…. *Id.* at pp. 49-50, N.T., 8/1/2023; pp. 98. By the end of Summer 2021, however, a dispute arose with the motel that forced Appellant [to] vacate his room, leaving him without a place to stay. N.T., 7/31/2023, pp. 49-50; N.T., 8/1/2023, pp. 98. Because he was family, [the victim and Pattinson] agreed to welcome Appellant into their home until he found permanent accommodation elsewhere. *Id.* at p. 50. In the meantime, [the victim] set Appellant up with a job at F[.]C[.] Young [& Co.,] Inc. [(FC Young), the victim and Pattinson's] employer, and even let Appellant stay in [the victim's] room, as the rest of the rooms in the [Thomas residence] were occupied. *Id.* at pp. 50, 116.

Initially, this arrangement worked out well, and [Pattinson, the victim], and Appellant worked together [at FC Young] throughout most of the remainder of 2021. Over time, however, Appellant and [the victim] had a "falling-out" involving [the victim's] girlfriend and Appellant's later lay-off from FC Young. N.T., 8/1/2023, pp. 181-83; N.T., 7/31/2023, p. 84. As Appellant later admitted to Commonwealth expert John S. O'Brien[,] II, M.D. [("Dr. O'Brien")[2]], these events sparked an animosity between [Appellant and the victim, which] became increasingly pronounced in the time leading up to [the victim's] murder. *Id.* at pp. 110, 181-83.

On [December 18, 2021,] the night of the murder, [Pattinson] first observed Appellant on his phone in the living room with [Longstreet]…. N.T., 7/31/2023, pp. 56-57. … [Pattinson] later … discover[ed] that both [Appellant and Longstreet] were gone. *Id.* at pp. 58-59. …

_____

[2] Dr. O'Brien testified at trial as a stipulated expert in the field of forensic psychiatry. N.T., 8/1/23, at 172-73.

Shortly thereafter, Appellant charged through the front door, armed with kitchen knives, shouting that he had been shot at. *Id.* at pp. 59-60. Neither [Pattinson] nor any other tenant [of the Thomas residence] heard these supposed gunshots. *Id.* at pp. 60, 119-20; Appellant's Exhibit D-2 []. Appellant then rushed into the kitchen[,] where he used a table and several chairs to barricade himself into the back-right corner[,] while he continued to swing his knives erratically. *Id.* at pp. 61-62.

Hearing the commotion, [the victim] came downstairs to see what was wrong. *Id.* at p. 62. Appellant again urged that there were "people outside" trying to kill him. *Id.* Both [the victim and Pattinson] stepped onto the front porch to investigate, but neither saw anything out of the ordinary. *Id.* at pp. 62-63. Nonetheless, Appellant remained unmoved. Over the next thirty to forty minutes, [the victim and Pattinson] attempted to calm Appellant down, but to no avail. *Id.* at pp. 63-65. Instead, Appellant refused to surrender his knives and became increasingly antagonistic and belligerent as the night wore on. *See*, *e.g.*, Commonwealth's Exhibit C-10 ("C-10") at 0:45-1:05 ([cell phone video the victim captured shortly before his murder] showing Appellant aggressively clinking his knives together and making an overhead stabbing motion with his right hand).

Just before 11:00[ p.m., the victim] abandoned his efforts to talk Appellant down and determined that police intervention was necessary. While dialing 911, [the victim] crossed from the living room into the threshold of the kitchen, telling Appellant what he was doing, and asking him to put the knives down while he did so. N.T., 7/31/2023, p. 68. As [the victim] crossed the threshold, however, Appellant suddenly lunged from behind his barricade and plunged his knife a full five inches into the side of [the victim's] chest. *Id.*; Commonwealth's Exhibit C-437 ("C-437") [(medical examiner's report)] pp. 1, 3. The medical examiner would later determine this to be the fatal blow. *Id.* …

As [the victim] struggled to fend Appellant off, [] Konrad, who had been listening in from his downstairs apartment, ran up the basement stairs and tackled the two men to the ground. N.T., 7/31/2023, p. 69…. While [Konrad and the victim] fought to get the knife out of Appellant's [] hand, Appellant continued to stab [the victim]…. *Id.* at p. 70. In total, Appellant stabbed [the victim] seven more times across his back and buttock, each wound measuring one to two inches deep. *See* C-437 at p. 3.

- 3 -

Meanwhile, [Pattinson] tried to disarm Appellant's right hand, but his grip on the knife was too strong for her to overcome. *Id.* at p. 71. In desperation, [Pattinson] ultimately interposed herself between Appellant's knife and her son, suffering a stab wound of her own in the process. *Id.* At trial, [Pattinson] testified that as she defended [the victim] from Appellant's [] attacks, she could feel his body go limp as he struggled to breathe. *Id.* at 72-73. Panicked, [Pattinson] screamed for someone else in the [Thomas residence] to call 911. *Id.* at p. 72.

Trial Court Opinion, 4/24/24, at 1-4 (footnote added; some citations modified).

Police subsequently responded to the Thomas residence, secured the scene, and placed Appellant in custody after he dropped the knives in his possession. The trial court explained, "Appellant's DNA was identified on [one] knife handle, while [the victim's] DNA was found on both the handle and blade." *Id.* at 7; *see also* generally Commonwealth's Trial Exhibit C-29 (DNA Report). In April 2022, the Commonwealth charged Appellant with criminal homicide[3] and the remaining above-mentioned offenses.

On November 6, 2022, Appellant filed a pre-trial "Notice of Intent to Present Defense of Insanity." Appellant stated his intent to "offer in his defense testimony to establish the insanity or other mental defect of [Appellant] at the time of" the murder. Notice of Intent to Present Defense of Insanity, 11/6/22, at 1. Appellant also identified expert witnesses he intended to call in support of an affirmative defense. *Id.*

_____

[3] 18 Pa.C.S.A. § 2501(a).

- 4 -

The matter proceeded to a non-jury trial on July 31, 2023. Importantly, at the beginning of trial, Appellant withdrew all affirmative defenses. N.T., 7/31/23, at 6 (Appellant's counsel stating the defense "will not be proceeding with any affirmative defense relative to insanity or mental health."); **see also** N.T., 8/1/23, at 5-6 (same).

At trial, the Commonwealth presented several witnesses, including Pattinson, Dr. O'Brien, emergency responders, and the medical examiner, Zhongxue Hua, M.D., Ph.D. (Dr. Hua). Dr. O'Brien, a forensic psychiatry expert, testified he 1) performed a psychiatric evaluation of Appellant prior to trial; and 2) authored an expert report detailing his findings on May 23, 2023.[4] N.T., 8/1/23, at 173-74.

> Dr. O'Brien testified as follows with regards to his diagnosis of Appellant:
>
> The only diagnosis I could render with reasonable medical certainty was mixed substance use disorder by history. … [Appellant's drug] use pattern included cannabis, or marijuana, synthetic cannabis, PCP, cocaine, opiates, and methamphetamine.
>
> **I was not able to arrive at a diagnosis of psychiatric illness**, either a psychiatric illness such as depression or manic depression or schizophrenia[,] or psychiatric illness of substance induced psychotic disorder. So I was not able to arrive at any of those diagnoses.

*Id.* at 188-89 (emphasis added); **see also id.** at 186 (Dr. O'Brien stating his "clinical examination [of Appellant] was absolutely devoid of any symptom of

_____

[4] Dr. O'Brien was the only testifying psychiatric expert in this case. Appellant did not present any expert testimony.

psychiatric illness."); *id.* at 184 (Dr. O'Brien observing Appellant "reports himself to not have a history of psychiatric illness or treatment, and his correctional records are consistent with that.").

Dr. O'Brien further testified:

I opined that [Appellant] was not intoxicated [at the time of the murder] so as to be lacking his faculties and sensibilities and was not overwhelmingly intoxicated so it influenced his behavior in a rather profound or significant way.

*Id.* at 191; *see also id.* ("I don't find [] there to be really any indicia of intoxication in [Appellant's] case"). Finally, Dr. O'Brien opined Appellant "was aware of the nature, quality, and wrongfulness of his behavior and [Appellant] even told [Dr. O'Brien] so during the [psychiatric] evaluation." *Id.* at 188.

Appellant testified as the sole defense witness. Appellant admitted he stabbed the victim, but maintained he acted in self-defense or imperfect self-defense.[5] Appellant testified that earlier on the day of the murder, he noticed $100 was missing from his wallet and confronted the other residents of the Thomas residence about it. N.T., 8/1/23, at 68-70. Further, a few weeks before the murder, the victim had a conversation with Appellant about a conflict between the victim and the victim's girlfriend, wherein the victim

_____

[5] "Unlike the affirmative defense of self-defense, which is a justification for the crime and, if accepted, results in acquittal, a finding of imperfect self-defense results in conviction of the offense of voluntary manslaughter," rather than homicide. *Commonwealth v. Busanet*, 54 A.3d 35, 52 n.11 (Pa. 2012).

threatened to stab his girlfriend. *Id.* at 73. Appellant alleged the victim also threatened to stab Appellant during this conversation, which caused Appellant to fear for his safety. *Id.* at 73-74.

Appellant testified that shortly before the murder, after hearing gunshots and suspecting they were directed at him, he rushed into the Thomas residence. *Id.* at 78-79. Upon hearing Appellant's account of the gunfire and disbelieving it, the victim and Pattinson confronted Appellant and asked if he was using drugs. *Id.* at 79; *see also id.* (Appellant confirming "it was known [in the Thomas residence] that [drug use] was an issue that [Appellant] had in [his] life previously."). An argument then ensued between Appellant and the victim; Konrad also participated. *Id.* at 80-81; *see also id.* at 80 (Appellant testifying the victim "liked to drink" alcohol and Appellant confronted the victim about his consumption during the argument).

According to Appellant, Konrad and the victim each procured a knife and threatened Appellant. *Id.* at 81-82; *see also id.* at 81 (Appellant testifying he observed that "[Pattinson] had reached in her sweater area, but I never fully [saw] her brandish the knife, only Konrad and [the victim]."); *id.* at 114 (Appellant alleging "Pattinson said it was" a knife in her sweater). Appellant barricaded himself in a corner of the kitchen, and armed himself with a kitchen knife, to defend against the threat. *Id.* at 83; *see also id.* at 87 (Appellant stating he was "trying to call 911," but his cell phone "[was]n't working").

Appellant testified as follows with respect to the stabbing:

- 7 -

> [The victim] runs at me. He says …, I'm going to make you kill me or I'm going to kill you and you're going to go to jail for the rest of your life.
>
> ….
>
> And as I hear him say that, I look up and he's in [a] full sprint running across the living room. And he jumps in the air and puts his hand [] over his shoulder. And then trying to come down, he jumps over all the barricade, lands in it and tried to stab me downward.

*Id.* at 90-91. At this moment, Appellant first stabbed the victim. *Id.* at 91; *see also id.* (Appellant stating he felt the knife go "[s]o deep I ha[d] to pull it out" of the victim's body).

Appellant testified after he pulled the knife out, "[the victim] was still swinging" at Appellant. *Id.* at 92. Appellant then proceeded to stab the victim several more times, purportedly in self-defense. *Id.* at 92-93. Appellant stated he repeatedly warned the victim, "[Thomas,] stop, you're going to die." *Id.* at 93. Appellant testified that after the victim fell to the floor, Appellant ran out of the Thomas residence. *Id.* at 94.

On cross-examination, Appellant confirmed that "after [the victim's] remarks about [the victim's] girlfriend," the victim "focused his anger on [Appellant.]" *Id.* at 108; *see also id.* at 110 (Appellant acknowledging he told "Dr. O'Brien that the animosity between [Appellant] and [the victim] … was getting worse leading up to the stabbing"). Appellant testified that during the argument preceding the murder, the victim and Konrad, each armed with a knife, "tried to take [Appellant's] life numerous times…." *Id.* at 112; *see*

*also id.* at 112, 113 (Appellant stating he believed his life was in danger and that he "was preparing to die"). *But see also id.* at 126 (Appellant conceding he was never stabbed). Appellant confirmed that the victim "said that he's going to make [Appellant] kill him," so that Appellant "would go to jail for the rest of [his] life…." *Id.* at 119. Appellant maintained that the victim "jumped" on Appellant's knife for "[t]he first stab wound," and that Appellant thereafter stabbed him more times. *Id.* at 131-33.

Appellant further averred the victim had previously exhibited suicidal behaviors:

> [The victim] tried to kill his ex-girlfriend, and he tried to run his truck into a tree. He tried to run his truck into the [Thomas residence] and supposedly kill everybody in the house. [Pattinson] told me this. And [the victim] was going to hit himself in the head with a hammer, and he poured gasoline over his own head.

*Id.* at 120.

At the conclusion of trial, the trial court found Appellant guilty of the above-mentioned offenses. *Id.* at 236-37. The court deferred sentencing. *Id.* at 237.

On September 27, 2023, the trial court imposed the mandatory sentence of life in prison without the possibility of parole for Appellant's first-degree murder conviction. For one of Appellant's aggravated assault convictions, the court imposed a concurrent sentence of 10 to 20 years in prison. The court imposed no further penalty on the remaining convictions.

Appellant timely filed a post-sentence motion on October 6, 2023, claiming the verdicts of guilt were against the weight and sufficiency of the evidence. Post-Sentence Motion, 10/6/23, ¶¶ 5-6. After a hearing on January 24, 2024, Appellant withdrew his post-sentence motion. Appellant timely filed a notice of appeal on February 23, 2024. Appellant and the trial court have complied with Pa.R.A.P. 1925.[6]

Appellant presents a single issue for review:

> [Was] the evidence, viewed in a light most favorable to the Commonwealth and drawing all proper inferences in the Commonwealth's favor, insufficient to enable the trial court, as the finder of fact, to reasonably determine that all elements of the crimes charged were established beyond a reasonable doubt, including the requisite *mens rea* of [Appellant] or that [Appellant] intentionally, knowingly, recklessly or negligently caused the death of the decedent[?]

Appellant's Brief at v (capitalization modified).

Appellant's argument section clarifies his sufficiency challenge and states it implicates only the first-degree murder conviction. *See* Appellant's Brief at 8-14.

> There is no dispute that the victim was unlawfully killed. There is also no dispute that the Appellant was responsible for the killing. What is in dispute is whether the Appellant's clear mental illness and delusions of being in danger negated a finding of malice and the specific intent to kill.

_____

[6] In its opinion, the trial court opined the Commonwealth adduced sufficient evidence to sustain each of Appellant's convictions. *See* Trial Court Opinion, 4/24/24, at 9-20.

*Id.* at 6; *see also id.* at 7 ("The evidence at trial, even viewed in a light most favorable to the Commonwealth, suggested that at the time the fatal wound was inflicted[,] Appellant was delusional and under the mistaken belief that he was in danger.").

> Appellant emphasizes his trial testimony, wherein he asserted
>
> he acted out of an unreasonable but genuine belief that he was under attack, potentially by the victim and others in the [Thomas] residence, as well as unknown persons outside of the [Thomas residence], which would support a conviction for voluntary manslaughter rather than first-degree murder.

*Id.* at 10-11 (citing *Commonwealth v. Briggs*, 12 A.3d 291, 306, n.14 (Pa. 2011) ("It is the presence of malice which distinguishes the offense of first-degree murder from other lesser crimes also involving an intentional and unlawful taking of a human life, such as voluntary manslaughter[,] where the killer possesses an unreasonable belief the killing was justifiable.")); *see also* 18 Pa.C.S.A. § 2503(b) (providing voluntary manslaughter applies to an intentional killing when the defendant "believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.").

> According to Appellant,
>
> the evidence in this case disproved malice, and the intent to kill, and suggested that a mentally ill [Appellant] killed [the victim] because of [Appellant's] delusions and that the killing was as a result of an unjustified belief that self-defense was necessary.

J-S41009-24

*Id.* at 14; *see also id.* at 13 ("[T]he totality of the circumstances before, during, and after the killing show an absence of malice and an absence of the intent to kill.").

The Commonwealth counters the evidence was sufficient to prove beyond a reasonable doubt all elements of first-degree murder, including Appellant's specific intent to kill the victim and malice. *See* Commonwealth Brief at 14-23. According to the Commonwealth,

> the evidence conclusively established Appellant's specific intent to kill. Importantly, no expert testimony established that [Appellant] was suffering from a diminished capacity at the time [of the murder]. To the contrary, the only expert that did testify[, Dr. O'Brien,] opined that Appellant was **not** suffering from any mental disabilities or intoxication that would have justified or mitigated this first-degree murder in any manner.

*Id.* at 22 (emphasis in original).

> Appellant's argument on appeal ultimately [implicates] a defense of diminished capacity or insanity – **defenses which he abandoned at the start of trial.** He now claims that he was delusional and suffering from a mental disability at the time of the stabbing, thereby causing him to unreasonably fear for his life. However, **this diminished capacity defense would have required supporting expert testimony**, of which there was none whatsoever.

*Id.* at 12 (emphasis added).

The Commonwealth argues

> Appellant chose to forego a defense based on diminished capacity or insanity at trial and, instead, attempted to convince the trial court that he was wholly innocent by presenting a thoroughly unbelievable, fabricated story on the stand asserting self-defense. The trial court properly discredited his testimony and found that he acted with the specific intent to kill [the victim] absent any form of legal justification.

- 12 -

*Id.* at 23.

"Because evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015).

> Our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.
>
> In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Peters*, 320 A.3d 1231, 1236 (Pa. Super. 2024) (*en banc*) (internal citations and brackets omitted).

"The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019) (citation omitted). Further, "the fact-finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses[.]" *Commonwealth v. James*, 297 A.3d 755, 768 (Pa. Super. 2023) (quotation omitted); *see also Commonwealth v. Norton*, 201 A.3d 112, 121 (Pa.

2019) ("[W]hen appellate review involves the trial court's findings of fact and credibility determinations, those findings are binding on the reviewing court if they find support in the record[.]" (citation omitted)).

"An individual commits first-degree murder when he intentionally kills another human being; an intentional killing is defined as a 'willful, deliberate and premeditated killing.'" ***Commonwealth v. Newton***, 318 A.3d 133, 139 (Pa. Super. 2024) (citing 18 Pa.C.S.A. §§ 2501, 2502(a), (d)). Our Supreme Court has stated,

> [t]o sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with **malice and a specific intent to kill**. [***Commonwealth v.***] ***Sanchez***, 36 A.3d [24,] 37 [(Pa. 2011); ***see also Commonwealth v. Packer***, 168 A.3d 161, 168 (Pa. 2017) ("Malice is a legal term" that encompasses "not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." (citation omitted))]. Moreover, a fact-finder may infer the intent to kill "based on the accused's use of a deadly weapon on a vital part of the victim's body." ***Id.*** **The intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent.** ***See***, ***e.g.***, ***Commonwealth v. Marrero***, … 687 A.2d 1102, 1105 (Pa. 1996).

***Commonwealth v. Ballard***, 80 A.3d 380, 390 (Pa. 2013) (emphasis added); ***see also Commonwealth v. O'Searo***, 352 A.2d 30, 37 (Pa. 1976) (stating the deadly weapon presumption is a presumption of fact "founded on human experience," since "[o]ne does not normally use a deadly weapon on a vital part of another's body unless he intends to kill." (citation omitted)).

> Our Supreme Court has held
>
> > the period of reflection required … to establish the specific intent to kill may be very brief[. I]n fact[,] the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possessed the conscious purpose to bring about death.

*Hitcho*, 123 A.3d at 746 (citation omitted). Further, "[t]his Court has previously acknowledged that intent can be difficult to prove directly because it is a subjective frame of mind." *Commonwealth v. Faulk*, 928 A.2d 1061, 1070 (Pa. Super. 2007) (citation and quotation marks omitted).

Under the Crimes Code, self-defense is a defense of justification, which is a complete defense to criminal liability. 18 Pa.C.S.A. §§ 502, 505. "While there is no burden on a defendant to prove [a] claim [of self-defense], before the defense is properly at issue at trial, there must be some evidence, from whatever source, to justify a finding of self-defense." *Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001).

> Self-defense is a complete defense to a homicide charge if (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force to prevent such harm; (2) the defendant did not provoke the threat that resulted in the slaying; and (3) the defendant did not violate a duty to retreat. Where the defendant has introduced evidence of self-defense, the burden is on the Commonwealth to disprove the self-defense claim beyond a reasonable doubt by proving that at least one of those three elements is absent. If the Commonwealth proves that the defendant's belief that deadly force was necessary was unreasonable but does not disprove that the defendant genuinely believed that he was in imminent danger that required deadly force and does not disprove either of the other elements of self-defense, the defendant may be found guilty only of voluntary manslaughter under the defense of imperfect self-defense.

- 15 -

***Commonwealth v. Jones***, 271 A.3d 452, 458 (Pa. Super. 2021) (internal citations omitted). "The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense." ***Id.*** (citations omitted).

> Our Supreme Court has instructed that imperfect self-defense
>
> is imperfect in only one respect — an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of [self-defense] … must be satisfied to prove unreasonable belief voluntary manslaughter. Thus, for example, if the defendant was not free from fault, neither self-defense nor imperfect self-defense is a viable defense.

***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124-25 (Pa. 2012) (citations and brackets omitted); ***see also Commonwealth v. Sanchez***, 82 A.3d 943, 980 (Pa. 2013). Significantly, "a viable claim of imperfect self-defense voluntary manslaughter cannot be based solely on the subjective state of mind of the defendant." ***Sepulveda***, 55 A.3d at 1126 (citing ***Commonwealth v. Sheppard***, 648 A.2d 563, 569 (Pa. Super. 1994)); ***see also Commonwealth v. Green***, 273 A.3d 1080, 1089 (Pa. Super. 2022) ("It is not the appellant who determines what is a reasonable belief. There must be some standard by which it is measured." (citations omitted)).

Moreover, to the extent Appellant's claim implicates the affirmative defense of diminished capacity, the defense, "whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to defendants who admit criminal liability but contest the degree of culpability

based upon an inability to formulate the specific intent to kill." ***Sanchez***, 82 A.3d at 977; ***see also Commonwealth v. McCullum***, 738 A.2d 1007, 1009 (Pa. 1999) ("When asserting a diminished capacity defense to first[-]degree murder, a defendant attempts to negate the element of specific intent to kill and, if successful, first[-]degree murder is reduced to third degree murder."). Notably, a defendant asserting diminished capacity **must** "**present psychiatric testimony** regarding mental disorders that affect the cognitive functions of deliberation and premeditation necessary to formulate a specific intent to kill." ***Commonwealth v. Williams***, 846 A.2d 105, 111 (Pa. 2004) (emphasis added; citation, brackets, and quotation marks omitted); ***see also McCullum***, 738 A.2d at 1009 (same).

Instantly, to the extent Appellant asserts his purported psychological condition(s) at the time of the murder negated the specific intent element of first-degree murder (and/or established his diminished capacity), this issue was not properly before the fact-finder. As stated above, Appellant withdrew any affirmative defense (including insanity and diminished capacity) at the beginning of trial. **See** N.T., 7/31/23, at 6 (Appellant stating he "will not be proceeding with **any** affirmative defense relative to insanity or mental health." (emphasis added)). Appellant also did not present any expert testimony. **See** ***Williams***, 846 A.2d at 111 (requiring a defendant asserting diminished capacity to present psychiatric testimony in support of claim); ***Sepulveda***, 55 A.3d at 1126 ("[A] viable claim of imperfect self-defense voluntary

manslaughter cannot be based solely on the subjective state of mind of the defendant."). Further, Dr. O'Brien, the only expert in the case, opined that at the time of the murder, Appellant 1) did not suffer from any psychological conditions; and 2) was not intoxicated. *See* N.T., 8/1/23, at 186, 188, 191.

Moreover, the trial court determined in its thorough Pa.R.A.P. 1925(a) opinion that the evidence was sufficient to establish all elements of first-degree murder beyond a reasonable doubt:

> [T]he only substantive dispute relevant to the [murder] charge is regarding Appellant's mental state at the time he stabbed [the victim]. Specifically, the sole question is whether Appellant had the specific intent to kill [the victim] at the time Appellant attacked. **The evidence adduced before this court is conclusive** that he did.
>
> The first source of evidence this court considered was [Pattinson's] eyewitness account of the stabbing. … [T]he only eyewitnesses to the entire sequence of events surrounding the stabbing were [the victim], [Pattinson], and Appellant. With [the victim] dead, and Appellant not credible, [**Pattinson's**] **testimony became the only credible source of information as to how the attack began.**
>
> At trial, [Pattinson] testified that she and [the victim] had tried to talk Appellant down for tens of minutes before he attacked. N.T., 7/31/2023, pp. 63-65. [**Pattinson**] **further testified that at no point that night did anyone at the Thomas residence threaten Appellant or confront him with any weapons.** *Id.* at p. 67. Nonetheless, when [the victim] crossed the kitchen threshold, Appellant charged out from behind the kitchen table and fatally stabbed him. *Id.* at p. 68. Thus, [Pattinson's] testimony established that **Appellant was the initial aggressor, that he attacked without provocation, and that he deliberately exited a point of safety to create a danger to himself and others.** Each of these are highly indicative of a subjective intent to kill.

- 18 -

Second, this court considered the nature of [the victim's] wounds and their respective depths in evaluating Appellant's mental state. Regarding the nature of a victim's wounds, the Supreme Court of Pennsylvania has opined that "a fact-finder may infer the intent to kill based on the accused's use of a deadly weapon on a vital part of the victim's body. [Moreover, t]he intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent." **Ballard**, 80 A.3d at 390.

In this case, Dr. Hua discovered eight discrete stab wounds, the deepest of which being the fatal wound to [the victim's] chest. **See** C-437 at pp. 1, 3. That wound caused a puncture to [the victim's] lung, which in turn produced the bulk of his internal hemorrhaging. **See id.** at p. 3. Dr. Hua opined that this bleeding was so severe that [the victim] had mere minutes to get medical attention if he wanted even a hope of survival. N.T., 8/1/2023, pp. 156-57. Therefore, like in **Ballard**, that Appellant stabbed [the victim] to death, and that he used a knife to puncture a vital organ[,] are powerful indicators of Appellant's intent to kill.

Moreover, Dr. Hua further testified that the knife travelled approximately five inches deep — through [the victim's] skin and past his ribs[,] before coming to rest in [his] left lung. **Id.** at pp. 155-54. Such a wound would have required significant force to achieve. In fact, Appellant himself acknowledged during [his] testimony that the knife had gone so deep that it required force to remove. **Id.** at p. 129. Further, [after Appellant inflicted the first wound,] despite being partially restrained by [] Konrad, Appellant delivered <u>seven more</u> one-to-two-inch stab wounds across [the victim's] left arm, back, and buttock. **See** C-437. The depth of each of these wounds, therefore, convincingly establishes that they were no accident. Instead, right from the first strike, Appellant put his full force into his attacks and did not hold back. This can only be explained by a subjective design to kill [the victim].

Third, **the evidence was clear that Appellant and** [**the victim's**] **relationship worsened in the weeks leading up to the stabbing.** For example, Dr. O'Brien … testified that one of the things Appellant talked to him about [during the psychiatric evaluation] was [Appellant's] negative feelings toward [the victim]. Specifically, Appellant noted that these feelings began because of certain comments [the victim] made about a girl [the victim] was dating at the time. N.T., 8/1/2023, p. 182.

- 19 -

[Appellant] also talked about his lay-off from FC Young and his belief that [the victim] could have done more to save [Appellant's] job. *Id.* at pp. 108-09. Appellant even speculated that [the victim] "had a hand in it." *Id.* at p. 109. Finally, Dr. O'Brien testified that Appellant mentioned an incident [that occurred on] the morning of the murder[,] where he believed someone in the [Thomas residence] was stealing from him. *Id.* In sum, Dr. O'Brien [opined] that a "rift" had opened between [Appellant and the victim], and that Appellant liked [the victim] less and less as time went on. *Id.* at pp. 182-83. While not conclusive, this testimony establishes possible motivations as to why Appellant would hurt [the victim].

More conclusive, however, were Dr. O'Brien's conclusions regarding Appellant's mental condition at the time of the attack. Specifically, **Dr. O'Brien concluded that Appellant was not intoxicated, nor was he suffering from a mental defect or other psychiatric episode at the time he stabbed** [**the victim**]. *Id.* pp. 188-91. Dr. O'Brien testified that Appellant's negligible psychiatric history, Appellant's logical and comprehensive recounting of the events leading up to the stabbing, Appellant's post-incident demeanor, and Appellant's later psychiatric testing were not consistent with any form of psychiatric illness beyond a substance abuse disorder. *Id.* at pp. 184-86. Accordingly, Dr. O'Brien concluded that Appellant was capable of engaging in intentional conduct. *Id.* at pp. 191-92.

Trial Court Opinion, 4/24/24, at 12-15 (underline emphasis in original; bold emphasis added; some citations and capitalization modified).

The trial court continued:

[M]ost significant to this court, **Appellant's own testimony made clear that he continued to stab** [**the victim**] **even *after* he knew that** [**the victim**] **was likely going to die.** Indeed, Appellant scarcely could have made this fact clearer. On direct examination, Appellant testified as follows:

APPELLANT: … I believe the first [stab wound,] I turned the knife backward, blocked [Thomas], and he jumped on [the knife]. And then I had pulled it out because [Thomas] was still swinging [a knife]. And I, -- that's the only knife I had. So I had pulled it out of

- 20 -

him and I did another stab the same way. I blocked my face and went back, turned it backwards, and stuck it straight in him again. And he was still swinging, and **I kept yelling at him "[Thomas], stop, you're going to die." ... Then I stabbed him a couple times** in the arm, I think, blocking him with the tray. And he just kept going. **I kept yelling at him "[Thomas], stop, you're going to die."** And he wasn't saying anything. He just kept swinging the knife. So I didn't want to stab him in the stomach anymore because **I knew he was going to die from the first one** because it was so deep because I had to pull [the knife] out. And I felt how deep it was.[]

N.T., 8/1/2023, pp. 92-93 (emphasis added). Appellant doubled down on this theme during cross-examination[,] where he and the Commonwealth had the following exchange:

Q: And your testimony is that you kn[e]w immediately that you killed [Thomas], that he was not going to live?

A: What's that?

**Q: You knew immediately that he was not going to live?**

**A: Yes, because ...**

**Q: You knew it was a fatal wound, right?**

**A: Yes, because I had to pull [the knife] out.**

Q: Yeah. You did pull it out. And it took some force to pull it out too, right?

A: Yes.

Q: It didn't just come out, because five inches of that knife went into the victim, right?

A: Yes.

- 21 -

Q: But your testimony is you took no physical actions to stab [Thomas] with the knife. It was his force that went into the knife that caused the injuries?

A: The first one, yes.

**Q: And then you kept stabbing after that.**

**A: Yes. Because he was –**

**Q: You knew he –**

**A: -- trying to stab me**

**Q: -- was going to die, right?**

**A: I had a feeling, yes.**

*Id.* at pp. 129-30 (emphasis added).

In sum, it is abundantly clear from Appellant's testimony that he knew, or at least strongly suspected, that [the victim] was mortally wounded after he stabbed him the first time. However, rather than take the opportunity to escape or otherwise deescalate, **Appellant stayed on the offensive and stabbed [the victim] seven more times**. [The trial court] considered this the clearest indication that at the point Appellant's knife entered [the victim's] body, it was Appellant's conscious object to make sure [that the victim] did not leave his home alive. Therefore, considering the totality of the foregoing facts, this court concludes that the Commonwealth proved Appellant guilt[] of first-degree murder beyond a reasonable doubt.

Trial Court Opinion, 4/24/24, at 15-16 (emphasis added; some capitalization and citations modified).

Finally, the trial court found the Commonwealth disproved Appellant's claim of self-defense, and that Appellant's testimony was incredible:

[T]he only witness who disputes Appellant's responsibility in killing [the victim] is Appellant himself. On the witness stand, Appellant provided an alternative account of events in which it was [Konrad]

- 22 -

and [the victim] who had the knives, and that it was **they** who were trying to kill **him**. ***See generally***, N.T., 8/1/2023, pp. 65-147. Moreover, [Appellant] insisted that he did not initially stab [the victim], but that [the victim] thrust **himself** upon Appellant's knife of his own volition. ***Id.*** at pp. 90-93. Appellant attributed this bizarre decision to a plot on [the victim's] part to commit suicide and frame Appellant for murder. ***Id.*** at p. 90, 119-20.

This [c]ourt, however, found Appellant's account thoroughly incredible. Not only is his story fantastical and self-serving on its face, it is also simply incompatible with the balance of credible evidence. For example, Appellant's story completely contradicts [Pattinson's] account, which this [c]ourt found to be the most credible, and indeed, the only other, eyewitness account of how the stabbing occurred. It also does not square with [the victim's] cell phone video, which shows Appellant, not [the victim], in an agitated and threatening state mere minutes before [the victim] was stabbed.[FN]

---

[FN] Indeed, the tone and tenor of [the victim's] statements to Appellant [in the cell phone video] are wholly inconsistent with [the victim] being the initial aggressor. [The victim] repeatedly [went] out of his way to deescalate the situation, even at one point telling [Konrad] to stay in the basement when [Konrad] called up to offer assistance. ***See*** C-10 at 0:50-1:00. Appellant attempted to explain this apparent inconsistency by insisting that everyone but him [in the Thomas residence] was engaged in an "act" designed to fabricate evidence should [the victim's purported] suicide plot succeed. N.T., 8/1/2023, pp. 119-20.

Trial Court Opinion, 4/24/24, at 11-12 (footnote in original).

Upon review, the trial court's foregoing reasoning and credibility determinations are supported by the record, and we discern no legal error or abuse of discretion. ***See id.*** at 10-16. We conclude that the evidence, viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to prove beyond a reasonable doubt that Appellant acted with malice and a specific intent to kill the victim. ***See Ballard***, 80 A.3d at 390 ("The

intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent." (citation omitted)); *Jones*, 271 A.3d at 458 ("The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense." (citations omitted)); *Newton*, 318 A.3d at 140-41 (holding evidence was sufficient to establish all elements of first-degree murder, including specific intent and malice, where 1) the appellant fatally stabbed the victim once with a kitchen knife; and 2) there was conflict between the appellant and the victim prior to the murder). Accordingly, as the evidence was amply sufficient to establish all elements of first-degree murder, and the Commonwealth disproved Appellant's self-defense claim, Appellant's sufficiency challenge does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/26/2024