846 A.2d 105

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Roy L. WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 9, 2002.

Decided April 1, 2004.

474

Billy Horatio Nolas, Philadelphia, James H. Moreno, for appellant, Roy L. Williams.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, Peter Carr, for appellee, Com. of PA.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

This matter is once again before us following a remand to the PCRA court for further factual findings. For the reasons set forth herein, we hold that Appellant is not entitled to relief, and we affirm the order of the PCRA court.

On January 27, 1988, after advising his friends that he was going to kill the first white man he saw, Appellant shot and killed James McDonnell, a white male who was walking along the sidewalk toward Appellant and the others. Appellant fled to Massachusetts where he committed another murder and additional crimes before being captured and returned to Pennsylvania to be tried for McDonnell's murder.

Appellant presented two witnesses in an attempt to prove that someone else had committed the crime, although he chose not to testify himself. The jury disagreed with this theory, and convicted him of first degree murder, 18 Pa.C.S. § 2502, and possessing an instrument of crime, 18 Pa.C.S. § 907. At the penalty hearing, the Commonwealth sought to prove one aggravating circumstance, 42 Pa.C.S. § 9711(d)(9) (significant history of felony convictions involving the use or threat of violence to the person); to that end, it introduced evidence that in Pennsylvania, Appellant had been convicted for rob-

bery three times, and that in Massachusetts, he had been convicted of manslaughter, and in a separate incident, armed robbery and assault and battery. After a colloquy, and contrary to his counsel's advice, Appellant refused to testify during the penalty phase to explain to the jury anything about his background or other pertinent information relative to the case. Instead, he offered the testimony of his mother, who advised the jury of Appellant's age; that Appellant had always been a good son; and that Appellant, his sister and his mother had lived in Philadelphia all of their lives. She asked the jury to spare his life.[1]

Following a penalty hearing, the jury found the one aggravating circumstance and no mitigating circumstances, and set the penalty at death. Appellant's sentence was affirmed on direct appeal. *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316 (1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996) (*"Williams I"*).

Appellant filed a petition for relief pursuant to the Post Conviction Relief Act, 42 Pa.C.S. § 9541–9546. The PCRA court denied the requested post conviction relief without an evidentiary hearing. On appeal to this court, we reviewed several issues which Appellant alleged in support of his request for a new trial. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167 (1999) (*"Williams II"*). We affirmed in part, reversed in part and remanded for further proceedings

---

1. The extent of Appellant's mother's testimony was as follows:

Q. Miss Williams, what is your relationship to Roy Williams sitting at the bar?

A. I'm his mother.

Q. Miss Williams, can you tell us Roy's date of birth?

A. 12/26/64.

Q. Now, Mrs. Williams, as you understand, of course, your son has been convicted of First Degree Murder. Is there anything you would like to say on behalf of your son this morning to the Jury?

A. I would like to say to the Members of the Jury that Roy has always been a good son to me. Roy and his sister and I lived here all our lives in Philadelphia. I recently moved to Nevada about two years ago. He's always been a good son. He's only 27. And I really could only ask that you find it in your heart to spare his life.

Q. Thank you.

N.T. 2/3/92 at 10.

to determine: (1) whether trial counsel was ineffective during the penalty phase for failing to make a sufficient argument for life imprisonment and for failing to investigate, develop and present significant mitigating evidence; and (2) whether trial counsel was ineffective during the guilt phase for failing to present a defense of diminished capacity.[2]

The PCRA court conducted an evidentiary hearing over the course of several days. Appellant offered anecdotal evidence of his traumatic childhood and history of mental health problems through the testimony of his mother, sister, father, and two childhood acquaintances, all of whom indicated that they were willing and available to testify at Appellant's trial. These witnesses testified that Appellant's father physically abused Appellant and his mother. Appellant's father rejected Appellant, and held out Appellant's cousin as his true son. Appellant's mother left Appellant's father when Appellant was approximately five years old, and they eventually moved in with her mother; Appellant witnessed his grandmother fall down the stairs which caused her subsequent death. Appellant continued to live in the predominantly white neighborhood, where he was harassed because he was bi-racial and because he wore thick glasses. When Appellant refused to go to school, Appellant's mother would discipline him by having male friends, as well as Appellant's father, beat him. The witnesses testified to incidents in which Appellant appeared to be incoherent, angry, and/or depressed. They also related that Appellant's mental health treatment began from age 8 and involved several hospitalizations at mental health facilities.

Appellant presented the testimony of his trial counsel, Richard Johnson, Esquire. Counsel testified that he and Appellant discussed Appellant's "life growing up", only to the extent that they had "general conversation ... about boxing, sports, things of that nature." N.T. 2/10/00 at 88–89. Counsel did not ask Appellant or his mother any questions about whether

---

**2.** A third issue which was remanded, pertaining to the alleged recantation testimony of eyewitness Holly Boone, was deemed to be moot when Boone recanted her recantation testimony during the PCRA remand proceedings. Appellant no longer pursues this issue.

Appellant had been mistreated as a child or his mental health history, and this information was never volunteered. Nor did counsel attempt to interview Appellant's other family members or acquaintances about Appellant's background, or consult with a mental health expert. Counsel stated that he had no reason to suspect that Appellant had suffered any childhood abuse or psychiatric incidents. Over the approximate one and one-half year period that counsel interacted with Appellant, he found Appellant to be "lucid" and "intelligent." N.T. 2/10/00 at 88.

Counsel admitted that he did not obtain any records about Appellant's past, including those pertaining to Appellant's mental health treatment or school records. Counsel did have information regarding Appellant's convictions in Philadelphia, but he did not follow up on any of the presentence investigation reports, one of which included a mental health evaluation conducted by the Philadelphia Department of Probation. N.T. 2/10/00 at 14, 33. Counsel did obtain Appellant's conviction records from Massachusetts, which indicated that a motion for appointment of a psychiatrist had been made, but counsel never followed up to determine whether any evaluation was conducted. N.T. 2/10/00 at 31.

Counsel further testified that he did not pursue a mental health defense because Appellant claimed that he was not involved in the crime. Appellant did not testify during the guilt phase and declined to testify at the penalty phase, telling counsel, "I am not going to beg." N.T. 2/10/00 at 73–74. Although counsel did not remember discussing the statutory mitigating factors with Appellant and his mother, he testified that it was his practice to do so. According to counsel, neither Appellant nor his mother ever indicated that Appellant had a history of abuse or mental health problems. Had counsel known about Appellant's mental health history, however, he agreed that he "would have changed his strategy" regarding Appellant's defense, and that he "would have had an obligation to explore" Appellant's mental health as a mitigating factor. N.T. 2/10/00 at 82.

Appellant's mother stated that she agreed to testify during the penalty phase and that she advised counsel of Appellant's "serious mental problems", as well as the racial harassment and rejection by his father. N.T. 2/10/00 at 137. She asserted that counsel's manner was hurried and said that they would talk when she reached Philadelphia to testify. N.T. 2/10/00 at 140. Appellant's mother met counsel a few minutes before she was going to testify, and again tried to tell him of Appellant's past history, but was told that "[t]he jury doesn't want to hear all that." N.T. 2/10/00 at 134. She testified that counsel never explained to her the concept of mitigating circumstances, N.T. 2/10/00 at 135, and that she "wasn't clear on what [she] was supposed to say" when she spoke to the jury. N.T. 2/10/00 at 149.

Appellant also introduced records that he claimed counsel should have obtained. These included presentence investigation reports and evaluations from the Philadelphia Department of Probation, indicating evidence of Appellant's family dysfunction, prior treatment at psychiatric facilities, and his personality disorder. Counsel also failed to obtain records regarding Appellant's treatment while a teenager at the Philadelphia Psychiatric Center, the Northeast Community Center for Mental Health/Mental Retardation, and the Children's Home of Easton, Pennsylvania. Appellant contends that these records would have provided counsel with information warranting further investigation and further consultation with a mental health expert.

Finally, Appellant presented testimony from two mental health experts. Dr. Robert Fox, a forensic psychiatrist, opined that Appellant's history of abuse, family dysfunction and trauma resulted in continuing psychological impairments. Dr. Fox explained that Appellant had been diagnosed with, *inter alia,* school phobia at age 8, suicidal ideation, depression, epileptoid personality disorder, depressive neurosis, adjustment disorder, and schizoid personality disorder. N.T. 9/18/00 at 88–91. Appellant was prescribed an antipsychotic medication at age 12, and was later given antidepressant medication. N.T. 9/18/00 at 59, 66–67. Dr. Fox concluded that

Appellant was brain damaged and also suffered from post-traumatic stress disorder. N.T. 9/18/00 at 94–95.

Dr. Barry Crown, a psychologist and neuropsychologist, reviewed Appellant's prior records and conducted neuropsychological testing. He detailed the psychological impairments caused by Appellant's abusive past, and diagnosed Appellant as suffering from brain damage. N.T. 10/25/00 at 71.

In rebuttal, the Commonwealth presented two expert witnesses. Dr. Robert Sadoff, a forensic psychiatrist, evaluated Appellant and concluded that he was not suffering from post-traumatic stress disorder and did not have any significant mental health illness. N.T. 12/15/00 at 51, 62. Dr. Thomas Swirsky–Sachetti, a psychologist and clinical neuropsychologist, refuted Dr. Crown's conclusion that Appellant suffered from brain damage, and opined that the test data, along with Appellant's earlier evaluations, indicated that Appellant was "within normal limits, without impairment." N.T. 12/18/00 at 40.

After evaluating this evidence, the PCRA court denied the PCRA petition. The court concluded that trial counsel had no reason to pursue mental health mitigation evidence since no one ever advised him about any mental health issues and "he was totally unaware of any problem". Tr. Ct. Opin. at 14–15. Even assuming that such evidence would have been presented to the jury, the court determined that it would not have affected the verdict of death. *Id.* at 15. The trial court opined that Appellant was not psychotic nor suffering from any cognitive impairment or significant mental illness; that he had the capacity to appreciate the criminality of his act; and that he was not acting under the influence of any extreme mental or emotional disturbance at the time of the murder. *Id.* at 15–16. The PCRA court also determined that counsel was not ineffective for failing to present a diminished capacity defense because Appellant declared his innocence and decided to pursue a defense of reasonable doubt and misidentification; he never displayed any character traits which would suggest the viability of a diminished capacity defense; and he chose not to testify at trial, after a colloquy. *Id.* at 17.

■■■■ This court's review of the denial of post-conviction relief is limited to an examination of whether the PCRA court's determination is supported by the evidence and whether it is free from legal error. *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1176 (1999). To prevail on claims of ineffective assistance of counsel claims raised during post-conviction relief proceedings, an appellant must establish by a preponderance of the evidence that (1) each of his claims has arguable merit; (2) trial counsel had no reasonable basis for his course of conduct; and (3) that counsel's ineffectiveness caused him prejudice, i.e., there is a reasonable probability that but for counsel's error, the outcome of the proceedings would have been different. *Commonwealth v. Marshall,* 571 Pa. 289, 812 A.2d 539, 545 (2002). We presume that Appellant's counsel was effective, and it is Appellant's burden to demonstrate otherwise. *Id.*[3]

■■■■ We will first address the issue pertaining to the guilt phase, namely, whether trial counsel was ineffective in failing to pursue a diminished capacity defense. In asserting diminished capacity, the defendant attempts to prove that he was incapable of forming the specific intent to kill; if successful, the defense will reduce the defendant's culpability for first degree murder to third degree murder. *Commonwealth v. McCullum,* 558 Pa. 590, 738 A.2d 1007, 1009 (1999). But this is an extremely limited defense—it requires the defendant to present psychiatric testimony regarding mental disorders that affect the "cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent" to kill. *Id.* Significantly, this defense applies only when the defendant admits his culpability, but contests his degree of guilt. *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 455 (1995).

**3.** Appellant "submits that his death sentence and capital conviction are erroneous under the 6th, 8[t]h and 14th Amendments" to the United States Constitution, and that he is entitled to relief "under the state law standard, in addition to the standard of the 6th Amendment." Appellant's Br. at 3, 5 (footnote omitted). However, as we have recently noted, the standards governing claims of ineffectiveness are the same under the PCRA as those under the Sixth Amendment, as applied to the states via the Fourteenth Amendment. *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 41–42 (2002).

If a defendant asserts his innocence, then he cannot claim diminished capacity, and correspondingly, his counsel cannot be deemed to be ineffective for failing to assert such a defense. *Id.*

In *Williams I,* we recognized that trial counsel arguably had a reasonable basis not to present a diminished capacity defense, since Appellant asserted that someone else had committed the murder. Yet we also acknowledged that in *Commonwealth v. Legg,* 551 Pa. 437, 711 A.2d 430 (1998), this court held that trial counsel had no reasonable basis for failing to present such a defense because he failed to consider and investigate that defense despite the defendant's substantial history of mental illness. We recognized that *Legg* was distinguishable from the present case (since the appellant in *Legg* admitted to having been the instrumentality of the crime, but claimed her actions were accidental), but reserved decision as to the effect of the holding in *Legg* on the present case, given our decision to remand this case for factfinding regarding Appellant's mental health evidence.[4]

Appellant faults counsel for failing to investigate and develop the evidence about Appellant's life history and impaired mental health as well as his history of alcohol and drug abuse. Thus, Appellant reasons, his counsel could not properly advise Appellant as to whether a diminished capacity defense was more viable than a claim of innocence.

This claim fails. Appellant baldly asserts that the evidence was sufficient to support such a defense, but fails to indicate any portion of the record which shows that he could not form the requisite specific intent; to the contrary, the trial court found no cognitive impairment. Nor does Appellant attempt to demonstrate that such a defense would have had a reasonable probability of success. Moreover, even if counsel had thoroughly investigated Appellant's past, the presentation of a

4. In conjunction with this claim, Appellant also asserted that his counsel should have pursued a defense that Appellant was guilty-but-mentally-ill. We clarified that this claim should have been raised in conjunction with the presentation of mental health mitigation evidence. *Williams II,* 732 A.2d at 1190. Appellant does not develop any argument relating to the claim that he was guilty-but-mentally-ill.

diminished capacity defense would have directly contradicted Appellant's assertions that someone else had committed the crime, and thus would not have been an available defense. *Paolello*, 665 A.2d at 455. We find the circumstances in *Legg* to be inapt since the defendant there admitted her participation, but argued that her actions occurred accidentally or in the heat of passion. Thus, Appellant is not entitled to relief on this claim.

We now turn to Appellant's claims that his counsel failed to properly investigate and prepare a case of mitigation for the penalty phase. *See Williams II*, 732 A.2d at 1188. Specifically, Appellant asserts that his counsel failed to investigate available evidence of the abuse, neglect and mistreatment Appellant suffered, and Appellant's history of mental health treatment. Appellant maintains that counsel did not begin to prepare for the penalty phase until after the jury returned with a guilty verdict; did not obtain records relating to mitigation and mental health; did not speak with most mitigation witnesses; did not inquire of Appellant or his mother into Appellant's life history or mental health problems; did not explain the concept of mitigation to the mother prior to her testimony; and presented an ineffective closing argument.

In *Williams II*, we addressed Appellant's claim that his counsel was ineffective for failing to investigate this mitigation evidence. We remanded to resolve the factual issue of whether counsel was made aware of Appellant's prior history and to evaluate the credibility of his experts. On remand, the PCRA court determined that counsel was not made aware of Appellant's past history of abuse or mental health treatment. The court stated that the mother's assertions that she was not clear on what she could say at the penalty hearing were not credible, and that neither Appellant nor anyone else advised counsel of a history of abuse, neglect or mental illness. We are bound by these credibility determinations, when, as here, there is record support for them. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 93 (1998), *cert. denied*, 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999).

We agree with Appellant that his claim has arguable merit. It is evident from the records and testimony presented at the PCRA hearing that substantial mitigation evidence existed at the time of Appellant's trial.

We also agree that counsel lacked a reasonable basis for his actions. We have explained that the reasonableness of counsel's investigation into possible mitigating factors often depends critically upon the information supplied by the defendant, and counsel cannot be found to be ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel. *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 45–46 (2002). Nonetheless, it is clear that counsel should have discovered the mental health records via an examination of Appellant's pre-sentence mental health evaluation, given his knowledge of Appellant's prior Philadelphia convictions. *See Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 737 n. 20 (2000) (evidence of mental illness available in sentencing record from defendant's prior robbery conviction; "[g]iven trial counsel's awareness of this offense, it is clear that he should have made reasonable efforts to obtain what is generally standard information in cases involving serious felonies.").[5] The evaluation referenced, *inter alia,* the fact that Appellant's parents had separated when he was approximately five years old; that he had "considerable difficulty with truancy and incorrigibility as a child"; that he was committed to the Philadelphia Psychiatric Center when he was approximately thirteen years of age for approximately four months; and that he had a "Mixed Personality Disorder with Elements of Schizoid Personality and emotional instability". Review of these records would have led reasonable counsel to inquire further about Appellant's background and to consider whether to consult with a mental health expert. Indeed, counsel himself admitted that had he known of mental health issues, he would have pursued them. N.T. 2/10/00 at 75–76.

**5.** The record does not contain a pre-sentence investigation report, but does contain the mental health evaluation conducted by the Philadelphia County Probation Department. The Commonwealth agrees that this evaluation was attached to the pre-sentence report.

Yet Appellant's claim fails since he cannot demonstrate prejudice. It is evident from the trial court's opinion that it made credibility determinations as to the testimony of the mental health experts, and resolved the issue against Appellant.

Appellant contends that the trial court erroneously focused solely on the mitigating circumstances under 42 Pa. C.S. § 9711(e)(2) (defendant was under the influence of extreme mental or emotional disturbance) and (e)(3) (the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired), and ignored the value of life history, hospitalization, commitment and mental health evidence as mitigating factors under the (e)(8) circumstance, 42 Pa.C.S. § 9711(e)(8) (any other mitigation evidence concerning the defendant's character and record and the circumstances of his offense).

It is unclear whether the trial court specifically considered the (e)(8) mitigator. While the court did appear to focus on the mental health evidence, the court also referred to and appeared to consider Appellant's life history. For example, the court indicated that neither Appellant nor any other person advised counsel of a history of abuse or neglect, even though Appellant "was a lucid and obviously intelligent grown man (age 27 at the time of trial)" who assisted in the preparation for his trial. Tr. Ct. Opin. at 14. After hearing the testimony from Appellant's family members and acquaintances regarding Appellant's background, the court noted that Appellant should not receive less of a penalty "because of a troubled childhood" (*id.* at 15); that Appellant was described as a "manipulator" (*id.*); and that Appellant "was a very angry boy who grew into a very angry man." *Id.* at 16. The court ultimately concluded that there were no mitigating circumstances from the medical reports or testimony which would have altered the verdict and sentence. *Id.*

Even assuming arguendo that the trial court did not consider the admissibility of evidence under the (e)(8) mitigating

circumstance, Appellant is still not entitled to relief, since we find that the remaining mitigation evidence would not have had a reasonable probability of changing the outcome of the proceedings. The records are replete with indications of Appellant's violent and aggressive history.[6] This history would have provided a context for Appellant's later violent adulthood, beginning with several robberies, escalating to the unprovoked murder of McDonnell, and culminating with the armed robbery, assault and beating death of other innocent victims. In light of the evidence of Appellant's violent past, both before and after McDonnell's murder, we cannot say that the omitted evidence would have changed the verdict of death. *See, e.g., Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 51 (1997) (counsel not ineffective for failing to present psychologist's testimony regarding defendant's personality disorders and emotional problems when testimony was "not self-evidently helpful to [the appellant], for it appears that [the appellant] addressed the problem of his lack of self-control and low self-esteem [identified by the psychologist] by engaging in a life of crime and injuring others."); *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877, 884 (presentation of in-depth evidence of defendant's psychological makeup during sentencing phase could have a negative impact on the jury, because it could portray him as a dangerous murderer who could kill again), *cert. denied,* 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995).[7]

**6.** *See, e.g.,* Philadelphia Psychiatric Center, Discharge Summary dated 7/2/79 (indicating that Appellant threatened his mother with a knife, broke household furniture, acted sadistically toward the family dog, and assaulted his sister three times, once requiring hospitalization; at the facility, "several times he showed extremely poor impulse control and tolerance of frustration."); Northeast Community Center for Mental Health/Mental Retardation, Initial Needs Assessment Log dated 3/19/79 (indicating that Appellant assaulted sister and threatened both his mother and sister with a knife, stating "I will kill you if you don't give me any money."); Children's Home of Easton, Discharge Summary (indicating that Appellant threatened one teacher verbally, and threatened another with a cast that he had on his hand).

**7.** We also find significant the fact that Appellant was given the opportunity to tell the jury about any mitigating evidence but refused to testify, stating "I will not beg." *Cf. Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613, 622 (1991) (appellant's failure to answer questions during

Appellant's reliance on *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), is misplaced. Appellant asserts that in *Williams v. Taylor*, neither the defendant nor the family disclosed that the defendant had been abused. Counsel presented Williams' mother and two lay witnesses, in addition to presenting some expert testimony, as mitigating evidence. Counsel did not fail to obtain Williams' social services and juvenile records because he thought they would be counterproductive, but because he believed them to be unavailable under state law. Appellant contends that Williams' counsel's preparation for sentencing and presentation of mitigating evidence was more extensive than that of Appellant's counsel, and the Court still determined that counsel's performance was deficient and prejudicial.

But the instant matter is significantly different from *Williams v. Taylor*: this case does not involve the "nightmarish childhood" involving neglect and abuse so extreme as to require incarceration of Appellant's parents and his commitment to the custody of a social agency, nor is there a claim of borderline mental retardation, or a trial judge who was convinced that the unpresented evidence raised a reasonable probability that the result would have been different if the jury had heard the evidence. Moreover, the Court in *Williams v. Taylor* found significant that the appellant turned himself in, expressed remorse and cooperated with police after the crime, factors which are not asserted in the instant matter.

Appellant also directs our attention to *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003),[8] in which the United States Supreme Court found that counsel's inadequate investigation into the defendant's background fell short of professional standards and prejudiced the defendant. Again, the facts of this case are qualitatively different: the appellant in *Wiggins* was left to eat paint chips and garbage

direct examination with information that he claims counsel should have raised "cannot now inure to his benefit.").

**8.** By separate order, we have granted Appellant's Application to file a post-submission communication to notify the court of this supplemental authority.

by his alcoholic mother; was hospitalized when she held his hand to a hot stove burner; was placed in foster care at age six, where he was physically abused by his foster mothers and sexually abused by one of his foster fathers; and was gang-raped by his foster mother's sons. Moreover, in *Wiggins*, the Court was persuaded by the fact that the appellant did not have a history of violent conduct that could have been introduced by the state to offset the mitigating evidence. In contrast, in the case *sub judice*, there is a wealth of evidence of Appellant's history of violence—both before and after the murder at issue. Thus, neither *Williams v. Taylor* nor *Wiggins* require a different result.

Accordingly, the order of the PCRA court is affirmed. Jurisdiction is relinquished.

Justice SAYLOR files a concurring and dissenting opinion in which Justice NIGRO and Justice BAER join.

Justice SAYLOR, concurring and dissenting.

The majority acknowledges the considerable mitigation evidence available for presentation at Appellant's capital sentencing proceeding and finds counsel ineffective for failing to identify it and to ensure its consideration by jurors in returning the penalty of death versus life imprisonment. Yet, based on the availability of rebuttal evidence favorable to the Commonwealth, the majority proceeds to find no reasonable probability that, had counsel performed as constitutionally required, the outcome would have been different (i.e., that at least a single juror would have selected life imprisonment).

In discounting the mitigation case that the jurors should have heard in light of the Commonwealth's potential rebuttal, it appears to me that the majority intrudes into the role that is reserved for the fact finder under the Pennsylvania death penalty statute.[1] In this regard, the testimony of the Com-

---

1. *Accord Commonwealth v. Ford*, 570 Pa. 378, 392, 809 A.2d 325, 334 (2002) (plurality) ("Although th[e] rebuttal evidence is substantial, we simply cannot agree with the PCRA court's conclusion that trial counsel's admitted failure to pursue and present mitigating evidence did not prejudice Appellant. It is the duty of the jury to consider all evidence-

monwealth's own post-conviction expert witness demonstrates how Appellant's mental-health and life-history mitigation evidence could have been used to confront the Commonwealth's rebuttal evidence,[2] much of which was already before the jury in connection with the significant-history-of-felony-convictions aggravator.

Having recognized the deficient stewardship of trial counsel in his failure to investigate and present to the sentencing authority substantial mitigation evidence, I believe that the Court should remand for the proper jury assessment.

Thus, I concur with regard to the guilt-phase resolution and dissent as to penalty.

Justice NIGRO and Justice BAER join this concurring and dissenting opinion.

## APPENDIX

### Excerpt from Cross-examination of Dr. Robert L. Sadoff

evidence of aggravating circumstances, evidence of mitigating circumstances as well as rebuttal evidence-in deciding whether or not a defendant should receive the sentence of death. Yet, the jury in the instant case was, in effect, given no meaningful evidence of mitigation to consider in their weighing process even though ... extensive evidence was available.").

Although I am aware that the United States Supreme Court has ruled that there is no federal constitutional impediment to appellate reweighing of aggravating and mitigating circumstances in at least certain instances involving defects in capital penalty verdicts, *see Clemons v. Mississippi*, 494 U.S. 738, 750, 110 S.Ct. 1441, 1449, 108 L.Ed.2d 725 (1990), the Pennsylvania General Assembly has not yet authorized this Court to undertake such function. Moreover, in practice, the appellate reweighing approach as implemented by the Supreme Court in recent cases more closely resembles a traditional prejudice assessment than an independent determination from the perspective of a surrogate factfinder. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, ——, 123 S.Ct. 2527, 2542–44, 156 L.Ed.2d 471 (2003) (affording relief by application of the reweighing standard on the conclusion that had the jury been confronted with this considerable mitigation evidence, there is a reasonable probability that it would have returned with a different sentence).

2. An excerpt from the cross-examination of the Commonwealth's expert, Dr. Robert L. Sadoff, a psychiatrist, is attached to this opinion as an appendix.

Q: Now in the presentence investigation that you reviewed, they noted—Dr. Stanton noted that Mr. Williams suffered from a schizoid personality?

A: It was part of a mixed personality with schizoid features. Yes, I think at that time ... the disruptive behavior can be seen as schizoid. I wouldn't argue with that personality disorder on Axis II.

Q: Okay. And they also—the records also reflect, I think, consistently finding of emotional instability?

A: From the environment I would think that would be a reaction that would be expected.

Q: Okay. And that is a reaction to the trauma and the abuse he was enduring?

A: I would think so, yes.

Q: And it's consistent with the records and affidavits that you've reviewed?

A: Yes, it is.

Q: Now, the history we've been discussing briefly, you had described that as traumatic?

A: The history as we discussed and that it's in the affidavit is traumatic, yes.

Q: It's a history of violence?

A: Yes.

Q: And the type of background that you've reviewed in the affidavits in the records is psychologically destructive?

A: Can be, yes.

Q: And the literature is pretty clear that it can have (sic) particularly long-term abuse such as this can have profound psychological impact?

A: It's something you try not to impose on people because you know that it can be harmful, yes.

Q: And you would agree that's present in this case?

A: The history is present and his reaction to it because of the records, yes.

Q: His reaction is almost—

A: I would agree that that kind of behavior can be harmful. It was harmful to him.

Q: So, Doctor, though we were just discussing his history, his reaction to his upbringing and the abuse and dysfunction is textbook in terms of how a child would react to prolonged subjection to this kind of abuse?

A: As having the kind of adolescent reaction, the depression, the anger, mostly the anger and his rebelliousness ..., yes, these are all classical reactions to that kind of trauma.

Q: As we discussed earlier, it affects ego formation and other developmental processes that have life-long implications?

A: It can and does, yes.

Q: And it's pretty clear from the record that's what was going on in this case?

A: He had a lot of that from the records, yes.

\* \* \*

Q: Now the kind of background that Mr. Williams endured can lead to depression?

A: It can, yes.

Q: And poor impulse control?

A: Yes.

Q: Lack of judgment?

A: Yes.

Q: Lack of insight?

A: Yes.

Q: Reasoning deficits?

A: Yes.

Q: And those are all present in the records that we've seen in this case?

A: We've seen that, yes.

N.T., Dec. 15, 2000, at 71–75.