J-S04022-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA HUPPERTERZ | : | |
| | : | |
| Appellant | : | No. 785 EDA 2025 |

Appeal from the PCRA Order Entered March 14, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0010217-2017

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY STABILE, J.: **FILED MAY 26, 2026**

Appellant, Joshua Hupperterz, seeks review of an order of the Court of Common Pleas of Philadelphia County (PCRA court), denying his petitions filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546 (PCRA). In 2019, after a jury trial, Appellant was convicted of first-degree murder and several related offenses. He was sentenced to a mandatory life term, and the judgment of sentence was affirmed on direct appeal. Appellant timely petitioned for PCRA relief, asserting that his trial counsel was ineffective and that the Commonwealth withheld exculpatory evidence prior to trial. The PCRA court summarily dismissed those claims, and Appellant now challenges that ruling. Finding no merit in any of Appellant's grounds for appellate relief, we affirm.

The underlying facts of this case have been previously summarized by this Court as follows:

On August 30, 2017, Joseph Burleigh received a phone call from his daughter, the victim, Jenna Burleigh, because she had gotten into a small car accident on Temple University's campus. Ms. Burleigh had just started her first week of classes at Temple, and was attending as a commuter student. Mr. Burleigh met his daughter on campus and called for AAA assistance. Because she had an early class the next day, Ms. Burleigh decided to stay at Temple and sleep at her friend Davis Trinh's home near campus. Once AAA arrived, Mr. Burleigh said goodbye to his daughter and went home.

That evening, Ms. Burleigh, Mr. Trinh, and Mr. Trinh's roommates went to a few bars on or near Temple's campus, their last stop being the bar, Pub Webb. Mr. Trinh had one drink and then left the bar sometime before 12:00 [a.m.], but Ms. Burleigh stayed. Ms. Burleigh then met [Appellant], who was also at the bar that night. The two talked and eventually left the bar together when it closed for the evening at 2:00 [a.m.]. [At approximately 4:00 a.m., [Appellant's] neighbor heard a woman's loud screams coming from the vicinity of his apartment.]

Soon after Ms. Burleigh left the bar with [Appellant], Mr. Trinh woke up at his home and saw that Ms. Burleigh had sent him multiple text messages[ ] seeking his help. Mr. Trinh messaged her back and called her multiple times, but Ms. Burleigh did not answer. Mr. Trinh then reached out to other friends of Ms. Burleigh, but no one was able to get in . . . contact with her. Therefore, during the early hours of August 31, 2017, the friends searched for Ms. Burleigh on and around Temple's campus. When they were unable to locate her, they called her parents. Ms. Burleigh's parents were also unable to get into contact with their daughter, so they contacted the Temple University Police Department and filed a missing person's report.

[Appellant's roommate, Jack Miley, who had been out with Appellant the previous evening and consumed Xanax, marijuana, and alcohol before passing out drunk, slept through the night and woke up in the early afternoon to find Appellant cleaning blood off the floor of their kitchen, which Appellant claimed was a result of him falling in a bush. Mr. Miley ran some errands and returned home to find Appellant gone. [Mr. Miley's] sisters then arrived and he gave them free reign of the apartment, although Appellant [had previously] told him not to enter his bedroom. Mr. Miley left that

evening with his sisters to stay with their family in Long Island for Labor Day weekend. Despite Mr. Miley being on vacation, when he called Appellant after leaving for Long Island, Appellant claimed to be in North Carolina.]

Temple police immediately began an investigation into Ms. Burleigh's whereabouts. Detectives determined that Ms. Burleigh did not attend her scheduled class that day, and did not appear to have even been on campus that day. Moreover, a check of area hospitals for Ms. Burleigh was also unsuccessful. Detectives did, however, discover from employees of Pub Webb . . . that[,] on the previous evening, Ms. Burleigh had left the bar with [Appellant]. Therefore, Captain Edward Woltemate of the Temple University Police Department called [Appellant] at approximately 5:15 [p.m.] to inquire about Ms. Burleigh's whereabouts. [Appellant] did not immediately answer, but did call the captain back at approximately 11:15 [p.m.], telling the captain that he had no recollection of the previous evening because he [drank $200 worth of shots]. The next morning, Captain Woltemate called [Appellant] again to see if [he] could assist police in determining Ms. Burleigh's path of travel on the night in question, but [Appellant] did not answer. Therefore, the captain and one of his detectives, Nicholas Chachula, went to [Hupperterz's] apartment building to see if anyone in the area had seen Ms. Burleigh. A resident of the building recognized [Appellant's] photograph and indicated that [Appellant] lived in apartment 1-R. The captain again called [Hupperterz's] phone multiple times in an attempt to gain entry into the apartment, but [Appellant] did not answer. Therefore, the captain and Detective Chachula obtained a key from the . . . landlord and entered [Appellant's] apartment to see if Ms. Burleigh was inside; however, they were unable to locate her.

At approximately 4:10 [p.m.] that same day, [Appellant] returned Captain Woltemate's calls and told the captain that he had just woken up for the day and was in South Philadelphia, but that he would leave to meet the captain at Temple. [Appellant], however, never went to Temple to meet the captain. Rather, [Appellant] was actually in [N]ortheastern Pennsylvania at his grandmother's home, after taking a Lyft there earlier in the day. [Appellant] brought with him a large plastic tote [and asked the Lyft driver, Avery Tucker, to cancel his trip on the mobile app so that he could pay in cash.]

In addition to Temple University Police, the FBI and the Philadelphia Police were also working to locate Ms. Burleigh. During the early evening hours of September 1, 2017, an FBI agent contacted the Pennsylvania State Police at Dunmore Barracks, located in Northeastern Pennsylvania, to request their assistance in the investigation. Corporal Benjamin Clarke was instructed to go and see if he could make contact with [Appellant] at his grandmother's house. When Corporal Clarke went to the residence, he met [Appellant] and his grandmother, Inez Stabilito. [Appellant] told the corporal that he was visiting his grandmother's house because he was about to start a heavy course[-]load that fall semester at Temple, and denied having any information about Ms. Burleigh. The corporal noticed, however, that [Appellant] had wounds to his hand and scratches on his neck. [Appellant] explained that he must have hurt his hand when he had broken a cereal bowl after drinking heavily on the night in question and that he was scratched during a sexual encounter earlier in the week. The corporal thereafter asked [Appellant] to go to the Dunmore Barracks in order to continue their conversation and so that pictures could be taken of [the] injuries. [Appellant] agreed and drove to the barracks with his grandmother. While at the barracks, [Appellant] was met by detectives from the Philadelphia Police Department and was transported back to Philadelphia.

[Also on the evening of September 1, Philadelphia Police officers executed a warrant to search Appellant's apartment for evidence pertaining to Ms. Burleigh's disappearance. In the trash behind the apartment, officers found a shirt Ms. Burleigh was known to own, a large blue sweatshirt similar to the one Ms. Burleigh's father had seen her wearing on the night before her disappearance, and a sports bra. Blood belonging to Ms. Burleigh and [Appellant] was splattered throughout the apartment, including [Appellant's] blood on the blade of a kitchen knife. None of the blood or the DNA in this area could be attributed to Jack Miley.]

The next day, on September 2, 2017, [Appellant's] grandfather, George Stabilito, was tending to his wife's property. While he was working, he went down to the lake near the home and entered a shed to check for snakes. In the shed, Mr. Stabilito immediately noticed a very large blue tote, which he had never before seen. He opened the tote and saw that a body was inside of it.

- 4 -

Pennsylvania State Police were contacted and responded to the scene, finding Ms. Burleigh's nude corpse in the tote.

An autopsy was performed and it was determined by the Philadelphia Medical Examiner that Ms. Burleigh's cause of death was strangulation. It was also discovered that Ms. Burleigh suffered injuries consistent with being struck by a fist, bitten, stabbed, and hit in the head with a foreign object. In addition, vaginal and rectal swabs were taken from Ms. Burleigh's body, and sperm containing [Appellant's] DNA was found in both areas of her body. Moreover, [Appellant's] DNA was also found in fingernail clippings taken from [her] body.

*Commonwealth v. Hupperterz*, No. 1544 EDA 2019 (Pa. Super. filed November 13, 2020) (unpublished memorandum) (quoting trial court opinion, 8/7/2019, at 3-7) (bracketed text in original, citations and footnotes omitted).

On January 17, 2019, following a jury trial, Appellant was convicted of one count each of first-degree murder (18 Pa.C.S.A § 2502(a)), possession of an instrument of crime ("PIC") (18 Pa.C.S.A. § 907(a)), abuse of a corpse (18 Pa.C.S.A. § 5510), and tampering with physical evidence (18 Pa.C.S.A. § 4910). The trial court imposed the mandatory life sentence as to the murder count (18 Pa.C.S.A. § 1102(a)(1)), followed by consecutive prison terms of 2.5 to 5 years as to the PIC count, 1 to 2 years as to the abuse of a corpse count, and 1 to 2 years as to the tampering count. Appellant filed a post-sentence motion, which was denied.

This Court affirmed the judgment of sentence on direct appeal, *see Commonwealth v. Hupperterz*, No. 1544 EDA 2019 (Pa. Super. filed November 13, 2020) (unpublished memorandum), and our Supreme Court denied allocatur on July 26, 2021. Thereafter, in 2022, Appellant timely filed

a PCRA petition (his first), followed by amended (counseled) petitions on January 18, 2024, and July 24, 2024, which are now the operative filings. In the operative petitions, Appellant raised various claims of ineffective assistance of trial counsel, as well as claims that the Commonwealth failed to disclose (a) video surveillance footage which would have supported an involuntary intoxication defense, and (b) evidence of investigating detectives' misconduct in unrelated cases.

The Commonwealth filed a motion to dismiss the petitions, and the PCRA court issued a notice of its intent to dismiss them without a hearing, pursuant to Pa.R.Crim.P. 907. Appellant filed a *pro se* response to the Rule 907 notice,[1] and the petitions were dismissed on March 14, 2025. A timely appeal was filed, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925. *See* Trial Court 1925(a) Opinion, 5/23/2025, at 1. In his brief, Appellant now raises seven issues for our consideration:

---

[1] The record reflects that Appellant was represented by PCRA counsel at the time of his *pro se* filing. Hybrid representation is prohibited in the Commonwealth, and our courts "will not accept a *pro se* [filing] while an appellant is represented by counsel; indeed, *pro se* [filings] have no legal effect and, therefore, are legal nullities." *Commonwealth v. Williams*, 151 A.3d 621, 623 (Pa. Super. 2016) (citing *Commonwealth v. Nischan*, 928 A.2d 349, 355 (Pa. Super. 2007) (finding *pro se* post-sentence motion filed while the appellant was represented by counsel was a legal nullity with no legal effect)). Courts generally take no action with respect to such filings, instead noting it on the docket and forwarding it to counsel pursuant to Pa.R.Crim.P. 576(A)(4). Here, like the PCRA court, we take no action with respect to Appellant's *pro se* response to the PCRA court's Rule 907 notice. The only issues we address are those which have been duly raised and sufficiently preserved for appeal by Appellant's counsel.

I. Did the PCRA Court err when it found that Appellant's constitutional rights under the Sixth and Fourteenth Amendment of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by counsel's objectively unreasonable decision not to assert a voluntary intoxication defense?

II. Did the PCRA Court err when it found that Appellant's constitutional rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by trial counsel's opening statement to the jury promising them that the Appellant would testify when that decision had not yet been made by Appellant?

III. Did the PCRA Court err when it found that Appellant's constitutional rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by trial counsel's failure to prepare for trial by timely consulting with a psychiatrist or substance abuse expert prior to trial and/or for calling the expert at the last moment, after rulings had been made limiting the scope of that testimony?

IV. Did the PCRA Court err when it found that Appellant's constitutional rights under the Sixth land Fourteenth Amendments of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by trial counsel's failure to obtain all of the available video evidence.

V. Did the PCRA Court err when it found that Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by the prosecution's failure to produce all the video evidence and/or trial counsel's ineffective failure to request a relevant missing evidence jury instruction?

VI. Did the PCRA Court err when it found that Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated by the Commonwealth's individual and cumulative suppression of evidence of investigating detectives misconduct histories?

VII. Did the PCRA Court err when it found that Appellant's constitutional rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 8 and 9 of the Pennsylvania Constitution were not violated based on the cumulative impact of all the other claims?

Appellant's Brief, at 8-9 (suggested answers omitted).

The first four claims in Appellant's brief concern the asserted ineffective assistance of his trial counsel. Each of these ineffectiveness claims will be addressed in turn below.

The PCRA is "the sole means of obtaining collateral relief and encompasses all other common law and statutory remedies for the same purpose that exist when [the PCRA] takes effect[.]" 42 Pa.C.S.A. § 9542. "On appeal from the denial of PCRA relief, [this Court's] standard of review calls for [it] to determine whether the ruling of the PCRA court is supported by the record and free of legal error." **Commonwealth v. Nero**, 58 A.3d 802, 805 (Pa. Super. 2012) (quoting **Commonwealth v. Calhoun**, 52 A.3d 281, 284 (Pa. Super. 2012)).[2]

A claim of ineffective assistance of counsel is cognizable under the PCRA. **See** Pa.C.S.A. § 9543(a)(2)(ii). Counsel is presumed effective, and a PCRA

_____

[2] This Court will afford great deference to the findings of the PCRA court which are supported by the record. **See Commonwealth v. Boyd**, 923 A.2d 513, 515 (Pa. Super. 2007). Legal conclusions, however, are reviewed *de novo*. **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012). The PCRA court may summarily dismiss a PCRA petition where there is no genuine issue of any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by holding further proceedings. **See Commonwealth v. Wah**, 42A.3d 335, 338 (Pa. Super. 2012); Pa.R.Crim.P. 907.

petitioner has the burden of proving otherwise by a preponderance of the evidence. *See Commonwealth v. Hanible*, 30 A.3d 426, 439 (Pa. 2011). "[T]he ultimate focus of this inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Commonwealth v. Kimball*, 724 A.2d 326, 330 (Pa. 1999) (quoting *Strickland v. Washington*, 466 U.S. 668, 696 (1984)). A reviewing court must consider "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id*. (citing *Strickland*, 466 U.S. at 696).

A PCRA petitioner must plead and prove by a preponderance of the evidence all three prongs of an ineffectiveness claim: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable or strategic basis for her action or inaction; and (3) the petitioner suffered prejudice due to counsel's deficient performance. *See Commonwealth v. Williams*, 980 A.2d 510, 520 (Pa. 2009); *see also Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987). Failing to satisfy any single prong of this test is fatal to an ineffectiveness claim. *See Commonwealth v. Gonzalez*, 858 A.2d 1219, 1222 (Pa. Super. 2004).

For the "reasonable basis" prong, "the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate [her] client's interest." *Williams*, 141 A.3d at 463.

As to the "prejudice" prong, the petitioner must show that there is a "reasonable probability that the outcome of the proceeding would have been different but for counsel's action or inaction." **Commonwealth v. Brown**, 161 A.3d 960, 965 (Pa. Super. 2017) (quoting **Commonwealth v. Spotz**, 18 A.3d 244, 260 (Pa. 2011)). "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." **Commonwealth v. Spotz**, 84 A.3d 294, 311-12 (Pa. 2014) (quoting **Commonwealth v. Ali**, 10 A.3d 282, 291 (Pa. 2010)).

In his first claim, Appellant contends that his counsel was ineffective in failing to assert the imperfect defense of diminished capacity (voluntary intoxication). This defense, if successfully asserted, "negates the element of specific intent" to kill, and mitigates a first-degree murder to third-degree murder. **Commonwealth v. Hutchinson**, 25 A.3d 277, 312 (Pa. 2011). The defense may be proven with evidence that the defendant's "cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill." **Id**. (citing **Commonwealth v. Rainey**, 928 A.2d 215, 237 (Pa. 2007)).

Here, we find that Appellant cannot establish that his counsel lacked a reasonable basis for only presenting the defense that someone other than Appellant killed the victim. This defense was consistent with Appellant's statements to police in which he alleged that his roommate, Jack Miley, was the perpetrator. It was therefore reasonable for Appellant's counsel not to

present an alternative defense which would have necessarily conceded that Appellant had initially lied to police. Doing so also arguably would have diminished Appellant's chances of prevailing on his primary and complete defense that he did not kill the victim. It follows that Appellant's trial counsel was not ineffective for failing to present an involuntary intoxication defense. *See e.g., Hutchinson*, 25 A.3d at 312-13 ("We have consistently declined to hold that trial counsel was ineffective for failing to advance a defense that directly and irreconcilably conflicted with the accused's claims of innocence."); *Commonwealth v. Gibson*, 951 A.2d at 1110, 1131 (Pa. 2008) ("[C]ounsel will not be held ineffective for failing to pursue a diminished capacity defense when the Appellant maintains his innocence throughout the trial."); *Commonwealth v. Williams*, 846 A.2d 105, 112 (Pa. 2004) ("Moreover, even if counsel had thoroughly investigated Appellant's past, the presentation of a diminished capacity defense would have directly contradicted Appellant's assertions that someone else had committed the crime, and thus would not have been an available defense."). Thus, Appellant's first claim has no merit.

In his second claim, Appellant contends that his counsel was ineffective in "promising" the jury during opening statement that Appellant would be testifying on his own behalf. Appellant argues that this comment caused prejudice because, when he ultimately did not testify, it allowed the prosecution to highlight that defense counsel's opening statement was based

solely on conjecture rather than on Appellant's testimony. *See* Appellant's Brief, at 35-36.

Some clarification of the record is needed to address Appellant's argument. Defense counsel, in the opening statement, advised the jury that the evidence would show Appellant and the victim had consensual sexual intercourse on the evening in question. However, after Appellant and the victim got into a "fight," and the victim slashed Appellant's hand with a knife, Miley entered the fray and killed the victim by strangling her. *See* N.T. Trial, 1/8/2019, at 89-90. The trial court then specifically inquired into whether Appellant would be testifying on his own behalf to establish certain details outlined in the opening statement, such as whether the victim consented to intercourse with Appellant. *See id*., at 111. Defense counsel explained that there was no guarantee Appellant would take the stand. It was defense counsel's belief that forensic evidence of consensual intercourse, and Miley's involvement in the victim's death, would be introduced at trial through the cross-examination of Miley, and the testimony of the medical examiner. *See id*., at 105-09, 114-14. In closing argument, defense counsel indeed argued, based on the evidence and inferences taken therefrom, that Miley killed the victim after she attacked Appellant. *See* N.T. Trial, 1/17/2019, at 47-78. The prosecution, in turn, did not emphasize, much less mention, Appellant's decision not to take the stand when delivering its own closing argument. *See id*., at 89-90. Rather, the prosecution simply argued that the evidence did

not support the theory of innocence proposed by the defense in its opening statement. *See id*., at 89-96. Additionally, the trial court instructed the jury prior to deliberations that Appellant had the right to remain silent, and no "inference of guilt, nor any other inference adverse to the defendant" could be drawn "from the fact that he did not testify in this case." *Id*., at 148; *see also* N.T. Trial, 1/8/2019, at 42 (advising jury prior to opening statements of a defendant's right to remain silent). The trial court also made no rulings adverse to Appellant to give the prosecution any leeway to comment on his decision not to testify.

In short, the record does not establish that defense counsel promised to present any evidence to the jury which was not later produced at trial. The record does not indicate that the jury drew any negative inferences against Appellant due to his decision not to testify. Thus, there is no arguable merit to Appellant's underlying legal claim, and the PCRA court did not err in denying relief on that ground.

In his third claim, Appellant contends that his counsel was ineffective in failing to timely consult his substance abuse expert (Dr. Kenneth Levy) prior to trial, resulting in limits on the scope of that witness's testimony. *See* Appellant's Brief, at 39-40. No relief is warranted because Appellant cannot satisfy the arguable merit and prejudice prongs of this ineffectiveness claim.

The failure of defense counsel to call or elicit certain evidence from an expert witness does not necessarily make counsel's performance deficient.

*See Commonwealth v. Williams*, 141 A.3d 440, 464 (Pa. 2016). In this context, the "arguable merit" prong of an ineffectiveness claim requires the petitioner to prove that "an expert witness was willing and available to testify on the subject of the testimony at trial, counsel knew or should have known about the witness and the defendant was prejudiced by the absence of the testimony." *Id*., at 460.

Prejudice, for purposes of proving arguable merit, is established where the unelicited testimony of a witness "would have been beneficial [for the defense] under the circumstances of the case." *Id*. (quoting *Commonwealth v. Sneed*, 45 A.3d 1096, 1109 (Pa. 2012)). It is the petitioner's burden to "show that testimony provided by the uncalled witnesses "would have been helpful to the defense." *Id.* (quoting *Sneed*, 45 A.3d at 1109).[3]

Here, Appellant's defense was that his roommate, Miley, killed the victim after she attacked Appellant with a knife. The prosecution sought to rebut that claim with evidence that Miley was an especially "deep sleeper" after consuming Xanax and large quantities of alcohol, as he did on the night of the murder. *See* N.T. Trial, 1/10/2019, at 176.[4] According to Miley, he had

_____

[3] Dr. Levy was in effect, an "uncalled" witness for present purposes despite taking the stand at trial because the substance of his proffered testimony – Miley's possibly proclivity for violence – was excluded.

[4] Miley testified that, on the night of the victim's murder, he had smoked marijuana, consumed one milligram of Xanax, and drank "12 to 15 beers, [and] six shots]." N.T. Trial, 1/10/2019, at 159.

already gone to bed before Appellant arrived at their apartment with the victim. *See* N.T. Trial, 1/11/2019, at 49-51.

Miley testified further that he had no memory of the evening, having remained unconscious, or at most, semi-conscious, once he went to bed. *See id*. It was not until the afternoon of the following day that Miley woke up and discovered Appellant cleaning up blood. *See id*., at 62-64. When Miley saw that Appellant had fresh cuts on his neck and one of his hands, Appellant explained that he had fallen into a thorn bush. *See* N.T. Trial, 1/10/2019, at 179-82. Miley did not learn of the victim's death, or Appellant's suspected involvement, until a day later when he was contacted by the police. *See id*., at 209-12.

A few days after the trial had commenced, and after Miley had testified, the defense attempted to rebut his testimony with evidence that the combination of Xanax and alcohol consumed by Miley on the night of the victim's murder could have made him violent and homicidal. *See* N.T. Trial, 1/16/2019, at 6-9. Specifically, counsel sought to introduce a written report and testimony of a psychiatrist, Dr. Kenneth Levy, that large quantities of Xanax and alcohol can "have the potential to place an individual at risk for violent and maladaptive behavior[,] potentially suicidal and homicidal behavior and be a danger to themselves and others." Defense Trial Exhibit 12, at p. 3 (Forensic Psychiatric Evaluation of Dr. Kenneth Levy, 1/15/2019). The trial court prohibited such testimony for several reasons:

> [T]hat is just so far beyond the pale of what I think is reasonably admissible; [(A)], coming at the eleventh hour; [(B)], not really being responsive; and [(C)], really creating confusion here for this jury, that because some tiny fraction of people may become homicidal who take Xanax and alcohol, and we know it's not most people by far, and then to suggest that that's affirmative evidence that this man is responsible for this killing is something that's not going to happen.

*Id*., at 11-12.

Additionally, the trial court made it clear that the disputed testimony was being excluded on relevance grounds, regardless of the timing of the production of the evidence:

> I don't think it's relevant. I think it has extremely limited probative value. [Dr. Levy] never examined the person he's talking about. He is not rendering an opinion that I detected in this report that this is something that happened in this case. What he's saying is that there's a possibility -- you know, when you look at the label on any medication that any person ever takes, there's all kinds of things that can happen when you ingest substances. It doesn't mean it happened in this case or that his testimony is admissible, particularly when there hasn't been a single shred of evidence from any source that Mr. Miley committed this murder other than the fact that he was present in the apartment at the time. That's it.

*Id*., at 119-20.

Although defense counsel was not permitted to elicit testimony that Miley's use of Xanax and alcohol made him violent, the trial court allowed Dr. Levy to opine on the extent to which those substances could have made Miley "blackout" or suffer memory loss. *See id*., at 121-22, 147-58. After doing so, Dr. Levy explained on cross-examination that he would have preferred to have interviewed Miley in order to opine on his likely reaction to Xanax and alcohol. *See id*., at 162-64. However, Dr. Levy only had been engaged by

- 16 -

the defense the day prior, and he did not have time to contact him. *See id*., at 164. Dr. Levy stated further that defense counsel had advised that no blood or urine screens were available for Miley. *See id*., at 163.

On these facts, we cannot find that Appellant carried his burden of proving the arguable merit and prejudice prongs of his ineffectiveness claim. As to arguable merit, it is entirely speculative that Appellant was prejudiced by Dr. Levy's inability to testify about instances in which individuals react violently to the combination of Xanax and alcohol. The record contains no evidence that Miley was prone to such a reaction, or that he in fact became violent on the night of the victim's murder.

It appears that Miley was never medically evaluated by Dr. Levy or anyone else to assess his likely reaction to consuming a large amount of alcohol and Xanax. Nor does the record does show that Appellant ever petitioned to obtain such information at the post-conviction stage.[5] Even had defense counsel been more prompt in engaging Dr. Levy as an expert witness, there is no factual basis upon which we could conclude that Dr. Levy's testimony would have ultimately been beneficial to the defense.

For similar reasons, Appellant cannot satisfy the "prejudice" prong of ineffectiveness. Appellant has not shown that there is a reasonable probability

_____

[5] A PCRA petitioner may request post-conviction collateral relief in the form of new discovery. Such a request may be granted "upon leave of court after a showing of exceptional circumstances." Pa.R.Crim.P. 902(E)(1).

that the outcome of his trial would have been different but for the timing of defense counsel's engagement of Dr. Levy as an expert witness. A thorough examination of Miley by Dr. Levy would not necessarily have yielded any evidence favorable to Appellant. But even assuming that Dr. Levy could identify Miley as a person who could possibly react violently to ingesting large quantities of alcohol and Xanax, the evidence adduced at trial would not at all suggest that Miley behaved in such a manner on the night that the victim was murdered.

The evidence against Appellant, on the other hand, was compelling. He did not dispute that he and the victim had sexual intercourse on the night of her murder. Nor did he dispute that after having sexual intercourse, he and the victim began fighting, at which time she armed herself with a knife, leaving Appellant with a deep slash on his hand, and cuts on his neck. After the victim was killed, Appellant then transported her body and clothing to a different part of the state to conceal them from authorities. In light of those facts, there is no reasonable probability that Appellant's trial could have had a different outcome had Dr. Levy been permitted to testify more fully about how Miley could have become violent after ingesting Xanax and alcohol. Thus, the PCRA court did not abuse its discretion in finding that Appellant's third claim lacks merit.

In his fourth claim, Appellant contends that his counsel was ineffective in failing to obtain available video evidence which was not presented at trial. *See* Appellant's Brief, at 48–49.

As the PCRA court correctly observed in its 1925(a) opinion, this claim was wholly undeveloped. *See* Trial Court 1925(a) Opinion, 5/23/2025, at 11. "Abstract allegations of ineffective assistance of counsel unsubstantiated by reference to specifics are not considered on appeal." *Commonwealth v. Lassen*, 659 A.2d 999, 1007 (Pa. Super. 1995) (citing *Commonwealth v. Silo*, 502 A.2d 173, 176, (Pa. 1985)).

In his brief, Appellant refers vaguely to undisclosed video footage which defense counsel knew the Commonwealth possessed. This "missing video" purportedly includes surveillance video footage of Appellant, the victim, and Miley at a bar, as well as a footage of the entrance of Appellant and Miley's apartment. *See* Appellant's Brief, at 49-50. Appellant notes that the footage of the bar shows that he was highly intoxicated, to the point that he once fell off of his seat. He states further that the footage of the apartment entrance was relevant because it could have been used to dispute the Commonwealth's timeline as to when police entered the unit to conduct a search.

Appellant argues that counsel "ignored" this video evidence, but he does not explain how counsel failed to obtain it, or precisely how it could have been used to prove Appellant's innocence. *See* Appellant's Brief, at 48-49. The video evidence itself is not identified, and the contents of these recordings are

not described in detail. Accordingly, this claim is insufficiently developed to allow for meaningful appellate review, and no relief is due on this claim. ***See generally Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007) (finding PCRA claim to be waived because arguments were not developed sufficiently for review).

In his fifth and sixth claims, Appellant contends that the Commonwealth violated his constitutional rights by withholding exculpatory evidence – video surveillance footage and the misconduct of investigating detectives.

As to the video evidence, Appellant asserts that the Commonwealth violated ***Brady v. Maryland***, 373 U.S. 83 (1963), a claim which is cognizable under the PCRA. ***See Commonwealth v. Simpson***, 66 A.3d 253, 264 n.16 (Pa. 2013).

"It is well-settled that ***Brady*** and subsequent precedent flowing therefrom impose[] upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused." ***Commonwealth v. Bagnall***, 235 A.3d 1075, 1085 (Pa. 20200). A ***Brady*** violation is established where a petitioner proves that: (1) the prosecution suppressed evidence; (2) the evidence was "exculpatory or impeaching, favorable to the defendant": and (3) the suppression of the evidence caused prejudice to the defendant. ***Commonwealth v. Paddy***, 800 A.2d 294, 305 (Pa. 2002).

"*Brady* evidence may not be cumulative of other evidence, cannot have been equally available to the defense, and cannot have been discoverable through the exercise of reasonable diligence." *Simpson*, 66 A.3d at 264 (internal citations omitted). A petition must establish prejudice by demonstrating a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*.

In the present case, Appellant has failed to establish a *Brady* violation with respect to undisclosed surveillance video recordings because none of the claim's requisite elements have been satisfied. Appellant has not specified the surveillance video footage which was allegedly withheld, the contents of the footage, exactly how it was favorable to the defense, or how and when the footage was acquired. The lack of development of the claim also prevents this Court from assessing whether the subject video footage was cumulative, equally available to the defense, or discoverable through the exercise of reasonable diligence. The trial court therefore did not err in denying relief on this ground.[6]

As to the asserted nondisclosure of police misconduct, we again find that Appellant's claim was deficient. In Appellant's brief, he seems to raise this ground for relief as both a *Brady* claim, and a substantive claim based on

---

[6] It follows that there is no underlying merit to Appellant's subclaim of ineffectiveness based on defense counsel's failure to request a missing evidence instruction based on the non-disclosure of the surveillance video recordings.

after-discovered evidence under the PCRA (42 Pa.C.S.A. § 9543(a)(2)(vi)). No relief is due regardless of how the claim is framed.

A **Brady** claim fails because, as this Court recently held, "the Commonwealth had no obligation under **Brady** to disclose to the defense evidence of misconduct by the subject officers in cases wholly unrelated to Appellant." **Commonwealth v. Jordan**, No. 778 EDA 2025 at *19 (Pa. Super. filed March 20, 2026) (unpublished memorandum). An officer's misconduct cannot be "material" or prejudicial to a petitioner unless it was committed in the petitioner's case. **Id**.[7]

The after-discovered evidence provision of the PCRA is also unavailing. Under section 9543(a)(2)(vi) of the PCRA, a petitioner is eligible for relief if it can be pleaded and proven that a sentence resulted from "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi). To obtain relief on such a claim, a petitioner must demonstrate:

> (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.

**Commonwealth v. Washington**, 927 A.2d 586, 595-96 (Pa. 2007).

_____

[7] Unpublished memorandum decisions of this Court, filed on or after May 1, 2019, may be cited for their persuasive value. **See** Pa.R.A.P. 126(b).

"If after-discovered evidence is based upon an officer's undisclosed misconduct, a PCRA petitioner bears the burden of establishing a direct 'nexus' between the undisclosed misconduct and the petitioner's case." **Commonwealth v. Baynard**, No. 605 EDA 2025 at *8 (Pa. Super. filed March 11, 2026) (citing **Commonwealth v. Foreman**, 55 A.3d 532, 536 (Pa. Super. 2012)).

Here, Appellant discusses at length the misconduct of several police officers who were involved in his case. **See** Appellant's Brief, at 55–71. However, none of the instances of misconduct recounted by Appellant were related to the present matter. The prior misconduct of police in unrelated cases does not establish a reasonable probability of a different outcome of the petitioner's trial. **See Foreman**, 55 A.3d at 536 (affirming denial of PCRA relief where petitioner failed to establish a nexus between his case and the cases in which police misconduct occurred). Thus, the PCRA court did not err in finding that this claim has no merit.

In his seventh and final claim, Appellant contends that the cumulative prejudice of his counsel's ineffectiveness and the Commonwealth's constitutional violations warrants relief. **See** Appellant's Brief at 71-72. Aside from a fatal lack of development, this cumulative prejudice claim fails because none of the individual post-conviction claims discussed above have any underlying merit. "[N]o number of failed . . . claims may collectively warrant relief if they fail to do so individually." **Commonwealth v. Johnson**, 966

A.2d 523, 532 (Pa. 2009) (quoting **Commonwealth v. Washington**, 927

A.2d 586, 617 (Pa. 2007)).  Thus, the order on review must be upheld.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/26/2026